**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

|  |  |
|---|---|
| Mark Lenzi, <br><br> Plaintiff, <br><br> v. <br><br> Marco Rubio, in his official capacity as United States Secretary of State; and the United States Department of State <br><br> Defendants. | Case No. <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT**

Mark Lenzi, by and through his undersigned counsel, hereby alleges and states as follows:

**PRELIMINARY STATEMENT**

1.      Plaintiff Mark Lenzi brings this action against Marco Rubio, in his official capacity as the United States Secretary of State, and the United States Department of State ("Defendants," "State Department," or "Agency") for violations of Section 501 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 (the "Rehabilitation Act"), and relevant provisions of the Americans with Disabilities Act of 1990 ("ADA") as amended by the ADA Amendments Act of 2008 ("ADAAA"), 42 U.S.C. §§ 12101 to 12213 (collectively, the "ADA"). Specifically, Mr. Lenzi's claims are directed toward disability discrimination: Defendants' failure to reasonably accommodate his disability, retaliation, and disparate treatment.

2.      Mr. Lenzi has been employed by the U.S. Department of State since 2011. For a significant portion of his career at the State Department, Mr. Lenzi has been employed overseas

as a Security Engineering Officer ("SEO") at the Diplomatic Security Bureau ("DS" or "Diplomatic Security") within the State Department.

3.      In 2017, while stationed abroad at the U.S. Consulate in Guangzhou, China, Mr. Lenzi, his wife, and their two children began experiencing sudden physical and sensory symptoms, including headaches, sleeplessness, lightheadedness, nosebleeds, and memory loss because of exposure to dangerous levels of pulsed microwave radiation. This affliction, now known in international media as "Havana Syndrome," has plagued scores of American officials stationed abroad in China, Cuba, and elsewhere. According to a 2020 National Academies of Science, Engineering, and Medicine report commissioned by the Department of State, the diagnosed injuries from this affliction are most likely due to pulsed microwave radio frequency radiation.

4.      In response to the Havana Syndrome crisis in Cuba, the first Trump administration withdrew most of its staff members from the embassy in 2017, stating publicly that U.S. diplomats abroad had experienced targeted attacks. On or around April 1, 2024, 60 Minutes aired an investigation showing Russian military intelligence unit 29155 being behind the attacks. The U.S. Intelligence Community has not yet attributed the attacks to a foreign actor.

5.      In June 2018, months after he and his family began experiencing these symptoms, and months after Mr. Lenzi initially voiced his concerns to his supervisors at the U.S. Consulate in Guangzhou who ignored him or worse, he and his wife were finally administered Department of State Havana Acquired Brain Injury Tests ("HABIT"), the results of which led to them being medically evacuated, or "medevac'd," to the Brain Injury Repair Center at the University of Pennsylvania, which is known to have treated numerous Havana Syndrome victims. There, Mr. Lenzi underwent testing and finally began receiving treatment for his injuries. In June 2018 Mr.

2

Lenzi was formally diagnosed with mild Traumatic Brain Injury (TBI) and prescribed numerous TBI therapies that he has to do for the rest of his life.

6.      In or about October 2018, Mr. Lenzi requested accommodation for his disability from the State Department's Disability and Reasonable Accommodation Division ("DRAD"). On November 9, 2018, DRAD approved Mr. Lenzi's reasonable accommodation.[1]

7.      Upon his return to the United States, Mr. Lenzi was assigned "overcomplement" or "DS/NOC" status in November 2018. This designation is typically assigned on a temporary basis until the personnel can be reassigned following further recovery.

8.      Mr. Lenzi was on overcomplement status for approximately five years. For the majority of this period, Mr. Lenzi had already obtained medical clearance from the State Department's Bureau of Medical Services ("MED") to serve in certain overseas positions. Yet, the State Department continually denied Mr. Lenzi's "bids" for overseas positions, keeping him siloed in a menial domestic post.

9.      As a result, Mr. Lenzi brought a lawsuit against the State Department in December 2021 for disability discrimination and retaliation for speaking out against the State Department's treatment of victims of Havana syndrome.

10.     In late March 2023, the parties settled that lawsuit.

11.     In August 2023, as part of the settlement terms, Mr. Lenzi was finally able to be stationed abroad at U.S. Embassy Helsinki, Finland and was removed from overcomplement status. Mr. Lenzi hoped that the matter was resolved, and his career would go back to its prior trajectory.

---

[1] Mr. Lenzi's first DRAD reasonable accommodation approval is attached as **Exhibit 1**.

12.     Unfortunately, over the past two plus years, the State Department has continued its campaign of discrimination and retaliation against Mr. Lenzi, necessitating the present lawsuit.

13.     In June 2025, Defendants took away Mr. Lenzi's access to his email and office. This has greatly curtailed his ability to access information in pursuit of this lawsuit.

14.     Mr. Lenzi brings this action to address Defendants' conduct occurring after the March 2023 settlement. It is currently limited to claims arising from two Equal Employment Opportunity ("EEO") Complaints filed by Mr. Lenzi. If necessary, Mr. Lenzi will amend this Complaint to address a third EEO Complaint when it becomes ripe.[2]

## JURISDICTION

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that this is a civil action arising under the Rehabilitation Act (29 U.S.C. § 791), which is a federal statute that furnishes the causes of action at issue here.

16.     This Court also has jurisdiction over this action pursuant to 42 U.S.C. § 2000e-5(f)(3), the jurisdictional provision of Title VII of the Civil Rights Act of 1964, which states that "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Act. Section 505(a) of the Rehabilitation Act, 29 U.S.C. § 794a(a), cross-references Title VII of the Civil Rights Act and makes clear that "[t]he remedies, procedures, and rights set forth in" 42 U.S.C. § 2000e-16, "including the application of" 42 U.S.C. § 2000e-5(f) through (k), "shall be available" to litigants "with respect to any complaint" brought under the Rehabilitation Act.

---

[2] The third EEO Complaint addresses Defendants' failure to accommodate Mr. Lenzi's disability after being involuntarily curtailed from his assignment in Helsinki.

## VENUE

17.    As noted above, the enforcement provisions of Title VII, including 42 U.S.C. §§ 2000e-5(f) through (k), apply to Rehabilitation Act claims. Pursuant to 42 U.S.C. § 2000e-5(f)(3), "[e]ach United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under" the Rehabilitation Act.

18.    Venue is proper in this district under the special venue provision recited in 42 U.S.C. § 2000e-5(f)(3), which states that an action "may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought." 42 U.S.C. § 2000e-5(f)(3).

19.    Mr. Lenzi's employer, the Diplomatic Security Bureau of the State Department, maintains its principal office at 1801 N. Lynn Street, Arlington, Virginia 22209. On information and belief, certain of the individuals that discriminated against Mr. Lenzi on the basis of his disability were convened at the DS Bureau principal offices in the Rosslyn neighborhood of Arlington, Virginia. Furthermore, on information and belief, most State Department officials who retaliated against Mr. Lenzi and committed other unlawful employment practices against him were, at all relevant times, stationed in Arlington, Virginia, or at other locations that are within the Eastern District of Virginia. Therefore, the unlawful employment practices at issue in this action

were committed in the state of Virginia. Furthermore, on information and belief, the employment records relevant to such unlawful employment practices are also maintained and administered at the DS Bureau offices in Arlington, Virginia referenced above.

20.     Pursuant to 42 U.S.C. § 2000e-5(f)(3), this action may therefore be brought in any judicial district in the state of Virginia. Id.; Richardson v. Alabama State Bd. of Educ., 935 F.2d 1240, 1248 (11th Cir. 1991) (holding that Title VII venue provisions permit venue provisions permit venue "anywhere in the relevant state" where "the unlawful employment practice is alleged to have been committed."). Venue is particularly appropriate in the Eastern District of Virginia, given that the locations listed above are located in this district.

## PARTIES

21.     Plaintiff Mark Lenzi currently resides for treatment at Walter Reed National Military Medical Center in Maryland, primarily due to his disability and Defendants' role in exacerbating his TBI symptoms and headaches. Plaintiff is a citizen of the United States.

22.     Mr. Lenzi was (and is) an employee of the United States Department of State, Bureau of Diplomatic Security during the relevant time periods recited in this Complaint, for purposes of the Rehabilitation Act. See, e.g., 29 C.F.R. § 1630.2(f). He began his employment with the Agency in or about August 2011.

23.     Defendant United States Department of State maintains its principal office at 2201 C St., NW, Washington, DC 20520. Mr. Lenzi was and remains employed by the Agency's Bureau of Diplomatic Security, which maintains its main office at 1801 N. Lynn Street, Arlington, Virginia 22209. Defendant Marco Rubio is the current United States Secretary of State and head of the Agency and is named as a defendant in his official capacity.

**FACTUAL ALLEGATIONS**

### A.    *Mr. Lenzi Joins the State Department and Is Injured at Post*

24.    Mr. Lenzi received his bachelor's degree in civil engineering from the University of New Hampshire in 1997, along with minors in Political Science, Hydrology, and Water Resource Management. Mr. Lenzi then served as a member of the Peace Corps in Poland as an environmental engineer. Afterwards, he was awarded a U.S. Department of State administered Fulbright scholarship to the Republic of Lithuania. He went on to work as a deputy spokesperson for Senator John McCain's presidential campaign in 2007 and 2008, then as a spokesperson for the New Hampshire Republican Party.

25.    In 2011, Mr. Lenzi joined the State Department to serve his country and put his engineering and foreign language skills to use. Since then, he has worked in dozens of countries—including war zones—helping to further the State Department's goal of creating a more secure, democratic, and prosperous world for the benefit of the American people and the international community. Mr. Lenzi's unique and award winning work for the Department of State has made the United States safer, stronger, and more prosperous.

26.    Mr. Lenzi's specialized skills and integrity have marked his approximately 15 years of exemplary government service. For a significant portion of his career at the State Department, Mr. Lenzi has been employed overseas as a Security Engineering Officer ("SEO") at the Diplomatic Security Bureau ("DS" or "Diplomatic Security") within the State Department, and has consistently received outstanding performance reviews throughout those years of federal employment. He is presently a tenured, mid-level SEO at the FP-033 grade level.

---

[3] The terms "FP-03" and "FS-03" are used interchangeably.

27.     Mr. Lenzi originally began working at the State Department to make use of his extensive language, engineering, and management skills in international affairs. As a Security Engineering Officer, Mr. Lenzi has worked at various U.S. embassies abroad managing and upgrading security networks and advising on technical issues. He started his career overseas at locations such as Frankfurt, Germany and Guangzhou, China, and has completed temporary duty assignments ("TDY")4 at many other locations such as Afghanistan, Ukraine, Uzbekistan, Russia, Chad, the Philippines, Estonia, Moldova, and many others. Mr. Lenzi is a particularly valuable asset to the State Department's missions abroad due to his fluency or advanced proficiency in multiple languages, including Russian and Polish, and working knowledge of other languages. With his advanced technical knowledge and cultural competency, Mr. Lenzi has been called upon to lead investigations into technical issues at U.S. Embassies abroad, and to lead "highly sensitive technical mission[s]" to "critical threat" posts.

28.     Beginning in August 2016, Mr. Lenzi was stationed abroad at the U.S. Consulate in Guangzhou, China.

29.     While living in Guangzhou, in or about November 2017, Mr. Lenzi, his wife, and their two children became afflicted with TBI symptoms that eventually led them to being qualified for HAVANA Act compensation for their injuries. Upon information and belief only about 30 other State Department officers and family members have qualified for eligibility for HAVANA Act.

30.     In June 2018, Mr. Lenzi was medevac'd to the Brain Injury Repair Center at the University of Pennsylvania, where Mr. Lenzi began receiving treatment for his injuries. In June 2018, he was formally diagnosed with mild Traumatic Brain Injury (TBI; concussion).

---

[4] A "TDY" refers to a short-term, non-permanent assignment at a location away from a service member's permanent duty station.

31.     On or about October 2018, Mr. Lenzi requested accommodation for his disability from the State Department's Disability and Reasonable Accommodation Division ("DRAD"). The requested accommodations included 2-4 hours of telework per day, extra time to complete tasks, and permission to wear prescribed tinted glasses at work as needed, among other accommodations.

32.     On November 9, 2018, DRAD granted Mr. Lenzi official accommodations for a period of six months and notified Diplomatic Security of such accommodations. Thereafter, DRAD approved each of Mr. Lenzi's requests to extend his official accommodations, as recently as July 2023. He retained his accommodation through November 2024, when he was involuntarily curtailed from his post in Helsinki and unjustifiably stripped of his reasonable accommodations. Prior to its April 2025 denial for a Reasonable Accommodation renewal, the State Department had never denied Mr. Lenzi a Reasonable Accommodation in the previous seven years since his injury.

**B.     *Mr. Lenzi Suffers Disability Discrimination and Retaliation, Resulting in a Prior Lawsuit***

33.     Beginning in May 2018, Mr. Lenzi began to speak out about the potentially damaging health effects of Havana syndrome and the State Department's insufficient response. This included sending unclassified emails warning his State Department colleagues that they were not being told the truth by the State Department, appearing on TV news programs such as 60 Minutes and being featured on front page articles in the New York Times, and more.

34.     Meanwhile, the State Department kept him in overcomplement status, rejecting his repeated bids for overseas positions in which he was qualified, and ensuring he would no longer have access to classified information, despite his security clearance.

35.     As a result, between 2020 and 2021, Mr. Lenzi filed several EEO Complaints. This culminated in Mr. Lenzi initiating a lawsuit before this court on December 8, 2021. *See Lenzi v. Department of State et al*, Case No. 1:21-cv-01371-PTG-IDD.

36.    In late March 2023, following mediation, the parties reached a settlement, and the matter was dismissed.

### C.    *Mr. Lenzi Begins an Overseas Assignment in Helsinki, Finland, Where He Suffers Discrimination, Retaliation, and Harassment*

37.    As part of the settlement, on or about August 4, 2023, Mr. Lenzi began a planned three-year assignment as a SEO at the U.S. Embassy in Helsinki, Finland.

38.    As the Officer in Charge of Engineering Security Office (ESO) Helsinki, Mr. Lenzi was the SEO responsible for the technical security of the U.S. Embassy Helsinki and U.S. Embassies Vilnius, Riga, and Tallinn. He oversaw and was responsible for a multinational staff, including a U.S. Navy Seabee.

39.    In July 2023, DRAD again approved Mr. Lenzi's reasonable accommodation, which provided similar accommodations to ones that had been approved numerous times before, such as doing brain injury therapies at work, wearing light sensitivity glasses, performing approximately four hours of telework per week, taking short breaks, and other accommodations.

40.    On August 30, 2023, Mr. Lenzi received an email announcing the opening of an SEO temporary duty assignment (TDY) to Kyiv, Ukraine. The TDY was scheduled between October 1 and 13, 2023.

41.    This posting stated that they were looking for an "Experienced SEO" at grade "FS-02 and above."

42.    Over the next week, no SEOs applied for the position.

43.    On or about September 7, 2023, the Kyiv TDY was reposted without any requirement for a certain level of experience. The role was now available to "[a]ll interested and available SEOs."

44.     Mr. Lenzi was qualified to perform a TDY in Kyiv, Ukraine. He has a strong working relationship with the then-U.S. Ambassador to Ukraine, Bridget Brink. He is the only SEO that is rated by the U.S. Government in Polish, Ukrainian, and Russian languages. And there was no longer a requirement for an individual more senior than Mr. Lenzi's grade of FP-03. Crucially, Mr. Lenzi already served as acting Officer in Charge of ESO Kyiv approximately nine years before.

45.     On September 7, 2023, Mr. Lenzi reached out to his supervisor in Frankfurt, SEO Robert McMurry, who immediately approved Mr. Lenzi to go on this TDY. However, despite the website showing Mr. Lenzi as the only applicant, Mr. McMurry noted, "I think they might have already picked someone to go during that timeframe."

46.     The bidding website continuously displayed that Mr. Lenzi was the only approved applicant for the Kyiv TDY. Mr. Lenzi reached out to SEO Brian Knarr regarding his interest in the position:

> For the SEO TDY to Kyiv in 22 days that I was approved for and am the only SEO applying for, Post here can get me inexpensive direct flights from Helsinki to Krakow around those dates and we are not planning any TDYs then and that is a perfect window for me in between TDYs to my constituents here.



47.     Mr. Lenzi chose to email Mr. Knarr because of past incidents where Mr. Knarr chose less qualified SEOs for TDYs and cancelled other Kyiv TDYs where Mr. Lenzi was the only approved applicant.

48.     Mr. Knarr was aware of Mr. Lenzi's documented disability for a diagnosed Traumatic Brain Injury (TBI) by 2019, after Mr. Lenzi sent an email to approximately 200 Security Engineering Officers and appeared on 60 Minutes. Mr. Knarr was also aware of Mr. Lenzi's prior EEO activity.

49.     On September 8, 2023, Mr. Knarr thanked Mr. Lenzi for volunteering but announced that "we no longer need another SEO on the trip . . . [because] recent events have now invalidated that need." Apparently, within approximately one day after Mr. Lenzi applied, "the needs of the mission changed."

50.     The same day, Mr. Lenzi received an email that the Kyiv TDY "has been cancelled."

51.     On September 18, 2023, Mr. Lenzi filed an EEO against the Bureau of Diplomatic Security for discrimination and retaliation.

52.     On September 20, 2023, during an office visit to Helsinki, Mr. McMurry told Mr. Lenzi that Mr. McMurry believed Mr. Knarr was making excuses and pretexts for Mr. Lenzi not going on a TDY to Kyiv. Mr. McMurry further stated that "Knarr and some in Washington ([Ralph] Gaspard, [Tamika DaShawn] Abbott, [Ronald] Stuart) know you are the most qualified but simply don't want you going on this TDY." Mr. McMurry confirmed his belief that management discriminated against Mr. Lenzi by repeatedly passing over him for a TDY in Kyiv.

53.     Mr. McMurry became aware of Mr. Lenzi's medical condition and reasonable accommodation in June 2023. Mr. McMurry was also aware of Mr. Lenzi's previous EEO activity against the Department.

54.     Throughout Mr. Lenzi's time at the State Department, he has never seen an advertised TDY with approved applicants cancelled in this manner. Especially given the State

12

Department's—specifically the Bureau of Diplomatic Security ("DS")—past history of disability discrimination and retaliation against Mr. Lenzi, this action can reasonably be inferred as a result of continued discrimination and retaliation.

55. Beginning in early 2024, Mr. Lenzi faced continued discrimination and retaliation, including but not limited to DS personnel, such as Regional Security Officer ("RSO") Nathan Herbert, spreading rumors that Mr. Lenzi's staff was coming to work early to avoid working with him, threats of being kicked out of post, and telling Mr. Lenzi not to report incidents of retaliation.

56. On information and belief, this behavior began after Mr. Lenzi's managers started getting notifications that Mr. Lenzi filed an EEO Complaint, and they would have to provide affidavits and testimony. On information and belief, this behavior was both due to Mr. Lenzi's disability and in retaliation for Mr. Lenzi filing the EEO.

57. The behavior continued further after Mr. Lenzi's repeated informal complaints to his supervisors—particularly Mr. McMurry and Mr. Herbert—regarding the discrimination, retaliation, and harassment Mr. Lenzi faced.

58. On February 3, 2024, RSO Herbert mentioned that Mr. Lenzi had arrived late to work that day. Mr. Lenzi explained that he was doing his prescribed brain injury therapies per his Reasonable Accommodation and works in the office later into the evening as a result. RSO Herbert told Mr. Lenzi that he went into Mr. Lenzi's post one morning and Mr. Lenzi's staff told RSO Herbert that they were concerned Mr. Lenzi was not there.

59. Mr. Lenzi expressed doubt and asked RSO Herbert what exactly his staff said because the staff was aware of Plaintiff performing his prescribed brain injury therapies at home in the mornings because they were designed by doctors to induce feelings of nausea and dizziness.

13

RSO Herbert then backtracked and said they did not express concern, but the staff theoretically "could be concerned."

60.    On February 20, 2024, Mr. McMurry informed Mr. Lenzi that he was flying on short notice to Helsinki in response to a conversation he had with RSO Herbert.

61.    A short notice trip by someone of McMurry's rank is rare in the Foreign Service.

62.    A few days later, based on the conversation with RSO Herbert, Mr. McMurry repeated the false rumor that Mr. Lenzi's staff was working earlier to avoid working with Mr. Lenzi, and that the Helsinki ESO under his leadership had become a toxic work environment.

63.    Mr. Lenzi denied that he contributed to the Helsinki post being a toxic work environment and informed Mr. McMurry that he sometimes came in later due to prescribed brain injury therapies and per his Reasonable Accommodation that his staff was fully aware and supportive of.

64.    Mr. McMurry replied that he understood and that he would meet with Mr. Lenzi's staff separately.

65.    When McMurry met with the staff, they denied that they had avoided working with Mr. Lenzi and said they simply came in early so they could leave earlier after an eight-hour work day so they could be home earlier to be with their kids (i.e., for personal reasons and convenience). For example, two individuals on Mr. Lenzi's staff stated that they had small children and had been coming in early at 7:00 a.m. since years prior to Mr. Lenzi's arrival in Helsinki to allow more time at home with their children.

66.    Mr. McMurry also told Mr. Lenzi that he met with the Embassy Management Officer, Todd Bate-Poxon who informed him that he had also heard this rumor in the embassy but

14

that he believed it was not true. However, by then, the false rumors had already damaged Mr. Lenzi's reputation.

67. For example, on February 27, 2024, Mr. McMurry met with the U.S. Ambassador to Finland, Douglas Hickey. Ambassador Hickey told Mr. McMurry that he was considering removing Mr. Lenzi from the post. Both Ambassador Hickey and Deputy Chief of Mission, Christopher Kraft, repeated the false rumors of issues and conflict between Mr. Lenzi and his staff, including that they were working earlier to avoid Mr. Lenzi. During the meeting, Mr. McMurry asked RSO Herbert if he believed the staff was working earlier to avoid Mr. Lenzi. RSO Herbert replied, "Yes."

68. Mr. Lenzi expressed alarm and disbelief to Mr. McMurry regarding the Ambassador's statement that he was considering removing Mr. Lenzi from post based on rumors that were verifiably false.

69. Mr. McMurry told Mr. Lenzi to keep quiet and keep his head down because the "Ambassador will always take the RSO's side no matter what." Mr. McMurry further told Mr. Lenzi not to raise issues such as retaliation and double standards because it would only harm Mr. Lenzi's reputation further. Mr. McMurry also said that some in DS management had it out for Mr. Lenzi, such as Ralph Gaspard, Tamika Abbott, and Ronald Stuart.

70. Each of these individuals was previously aware of Mr. Lenzi's disability and ongoing treatment.

71. These events led to an increase in Mr. Lenzi's blood pressure and stress, increasing his post-concussion headaches.

72. On approximately April 30, 2024, Mr. Lenzi added to his first EEO additional allegations of discrimination and retaliation, as well as a hostile work environment.

**D.      *Defendants Refuse to Sign off on Award Nomination***

73.      Approximately three months later, in July 2024, Ambassador Maria Brewer, the Deputy Director of the Foreign Service Institute, nominated Mr. Lenzi for the Judith "Judy" Heumann Memorial Award for Leadership and Service in Accessibility, Disability Rights, and Inclusion (the "Award"). Department of State award nominations require the signature of a supervisor—in this case, Mr. McMurry.

74.      Mr. McMurry stated that he and another supervisor, Hebert, were unaware of Mr. Lenzi's involvement in the development or advancement of a certain policy identified in the nomination.

75.      Ambassador Brewer responded that she revised the nomination to correspond more closely with Mr. Lenzi's most recent Employee Evaluation Report ("EER"), which Mr. McMurry previously approved. Ambassador Brewer further stated that although Mr. Lenzi did not have a formal role in a particular office related to the policy, she "personally witnessed his advocacy and coordination with senior Department leadership on these and other important accessibility issues."

76.      Mr. Lenzi had also informed Mr. McMurry in May 2024 that he had been working on the policy.

77.      However, Mr. McMurry responded that because he could not personally verify what Ambassador Brewer had written, he would not sign off on the Award nomination—which is required for it to move forward. This is despite previously stating and approving similar language in Mr. Lenzi's EER.

78.      Ambassador Brewer emailed Mr. Lenzi regarding Mr. McMurry's response:

> By now you will have seen the next set of pushback. I am of two minds - 1) just accept the edits and move forward or 2) push this to PDAS Carlos Matus and describe the absolute level of disrespect and harassment, not just to you but also to me at this point. Please let me know your preference. (I may still do the second based on the level of anger I am experiencing at the moment.)

16

79.     Ambassador Brewer contacted DS management regarding Mr. McMurry's behavior. Afterwards, Deputy Assistant Secretary of State Ronald Stuart signed the award nomination instead of Mr. McMurry. Mr. Lenzi's hard work and achievements were accurately reflected in the award nomination. There is no justifiable reason that Mr. McMurry could not approve the nomination.

80.     On information and belief, Mr. McMurry declined to approve Mr. Lenzi's nomination in retaliation for Mr. Lenzi naming Mr. McMurry in an EEO Complaint.

**E.    Defendants Prevent Mr. Lenzi's Approval for Additional TDYs**

81.     In or around August 2024, Mr. Lenzi needed to go on several TDYs to constituent posts he was responsible for. On September 5, 2024, Mr. McMurry informed Mr. Lenzi that all "TDY support travel is still on pause for you" until certain reports were fully completed following feedback. Mr. McMurry also stated that Mr. Lenzi could not go on the TDYs unless he signed up for certain writing classes by September 25, 2024.

82.     The following day, Mr. Lenzi responded that each of the reports had already been completed, approved by the appropriate Regional Security Officer, and submitted. Mr. Lenzi also asked Mr. McMurry (as he had before) to stop repeatedly requesting Mr. Lenzi take writing classes. Mr. Lenzi explained that he has received awards for his writing and has published op-eds in most of the leading American news outlets. As such, Mr. Lenzi stated that he would not register for writing classes, and that he considered Mr. McMurry's request harassment.

83.     In early October 2024, Mr. McMurry prevented Mr. Lenzi from going on a TDY to U.S. Embassies Vilnius and Riga. Mr. Lenzi was the only member of his staff not able to go on these TDYs.

17

84. There is no requirement in the State Department for Mr. Lenzi to take these writing classes to be eligible for a TDY. On information and belief, no other SEO has ever been restricted from going on a TDY based on failing to take writing classes.

85. On information and belief, Mr. McMurry restricted Mr. Lenzi from going on these vital TDYs and imposed additional requirements on him in retaliation for alleging discrimination against him in Mr. Lenzi's EEO Complaint.

86. Mr. McMurry also instructed a technician to forge Mr. Lenzi's signature over Mr. Lenzi's name and title without Mr. Lenzi's authorization for a $5 million inspection, sign-off, and authorization for a Technical Security Upgrade project Mr. Lenzi was responsible for at U.S. Embassy Vilnius.

87. On October 8, 2024, Mr. Lenzi filed a second EEO against the Bureau of Diplomatic Security for ongoing incidents of disability discrimination, retaliation, and hostile work environment.

88. In November 2024, after Mr. Lenzi alerted officials in Washington about the above retaliation including the forgery of his signature for a crucial technical security project at U.S. Embassy Vilnius, Mr. Lenzi was involuntarily curtailed from his post in Helsinki. He was moved to overcomplement status and given a menial role that does not allow him to utilize the essential skills he has built over his nearly 15 years working as an SEO for the State Department. This also provided Mr. Lenzi with fewer opportunities for career advancement.

89. Mr. Lenzi was qualified for his role in Helsinki and consistently achieved outstanding performance. Mr. Lenzi was also nominated for four prestigious awards while working in Helsinki.

90.     On information and belief, Defendants involuntarily curtailed Mr. Lenzi in retaliation for his naming his Helsinki supervisors and other high-level personnel in EEO Complaints, including Christopher Krafft, Robert McMurry, and Nathan Herbert.

91.     Each of these individuals knew of Mr. Lenzi's disability and his EEO activity.

**F.     *Defendants Strip Mr. Lenzi of His Reasonable Accommodation and Fail to Provide a New One[5]***

92.     While in Helsinki, Mr. Lenzi had a reasonable accommodation that, among other things, allowed him to telework for a set number of hours each week.

93.     Mr. Lenzi's reasonable accommodations "are not limited to a particular location or assignment. They are portable and travel with the employee."

94.     However, after being involuntarily curtailed from Helsinki, Defendants required Mr. Lenzi to renew his reasonable accommodation. On approximately February 11, 2025, Mr. Lenzi's supervisor, Khaled Hafid, signed off on a telework agreement. Yet, on February 26, 2025, Mr. Hafid unjustifiably revoked Mr. Lenzi's ability to telework. In doing so, he stated that "Telework under no circumstances is permitted."

95.     On March 4, 2025, Mr. Lenzi formally applied through DRAD for a reasonable accommodation, including to telework similar to his reasonable accommodation in Helsinki and at prior posts. He stated in the application that teleworking would |help to reduce post TBI photophobia/light sensitivity, visual-spatial perception issues, post TBI headaches, cognitive fatigue, post TBI blood pressure regulation issues and therefore allow me to better perform the DS High Threat Post (DS/HTP) Desk Officer duties.

---

[5] Mr. Lenzi will expand on these allegations regarding Defendants' failure to provide a reasonable accommodation once his third EEO becomes ripe.

19

96.    Since November 2024, Mr. Lenzi has not received renewal of his reasonable accommodation, despite providing all necessary information to do so. This included two supporting letters from doctors that both indicated the reasonable accommodations renewal was necessary and not having the reasonable accommodations would have negative implications on Mr. Lenzi's health.

97.    On or around April 30, 2025 Mr. Lenzi's Reasonable Accommodation renewal request was denied by DS management officials.

98.    This was the only time in approximately six years that the State Department did not grant and renew Mr. Lenzi's reasonable accommodation.

99.    This failure to accommodate has resulted in exacerbating Mr. Lenzi's headaches and other post-concussion symptoms. Further, instead of being able to do his prescribed brain injury therapies at home, Mr. Lenzi was forced to come into the office with his symptoms of traumatic brain injury.

**A.    EEO Complaints**

100.    Mr. Lenzi filed three Formal Complaints of Discrimination with the Equal Employment Opportunity Commission ("EEO" or "EEOC") against the State Department between 2023 and 2025. Two of them are currently at issue in this action:

      a.    On September 18, 2023, Mr. Lenzi filed EEO Case No. DOS-456-23 (the "2023 EEO");[6] and

      b.    On October 8, 2024, Mr. Lenzi filed EEO Case No. DOS-0014-25 (the "2024 EEO").[7]

---

[6] The 2023 EEO, an Amendment, and a list of Accepted Allegations are attached as **Exhibits 2, 3, and 4**.
[7] The 2024 EEO, an Attachment, and a list of Accepted Allegations are attached as **Exhibits 5, 6, and 7**.

101.    Both EEO Complaints were investigated by the State Department's Office of Civil Rights ("OCR").

102.    On July 9, 2025, the Agency issued a Final Decision against Mr. Lenzi's allegations in the 2023 EEO. According to the Statement of Claims:

[Mr. Lenzi] alleged that the Agency discriminated against and harassed him because of his disability (physical) and prior protected EEO activity when:

1.    On September 8, 2023, Complainant learned that his TDY assignment to Kyiv, Ukraine was canceled; and

2.    Complainant was subjected to a hostile work environment due to rumors being spread that his staff was coming to work early to avoid working with Complainant, threats made of Complainant being kicked out of post, and management informing Complainant not to report incidents of retaliation beginning on September 8, 2023, and occurring as recently as February 23, 2024.

103.    The Final Decision provided that in accordance with 29 C.F.R. § 1614.407(a), Mr. Lenzi could elect to file a civil action in federal court. As that provision states, Mr. Lenzi has a right to file a civil action within 90 days of receiving the agency's final action on an individual or class complaint. This complaint has thus been filed within 90 days of the receipt of the Final Decision on the 2023 EEO.

104.    The 2024 EEO was last updated on January 15, 2025. Its Accepted Allegations are:

Because of your disability (Physical) and retaliation (Participation – prior EEO complaint) you believe you were discriminated against when:

1.    On 01-October-2024, you were denied TDY travel critical to your position.

2.    On or around October 25, 2024, your portfolio was revised to exclude TDY travel responsibilities.

3.    Since August-2024 and continuing to the present, you were subjected to a hostile work environment that was characterized by, but not limited to repeated scrutiny of your work performance through requests to complete writing classes and pushback on your cited contributions to a DEIA related initiative recently publicized by the Ambassador.

21

105.    It has been more than 180 days since the most recent amendment occurred. Therefore, in accordance with 29 C.F.R. § 1614.407(b), Mr. Lenzi may exercise his right to file a civil lawsuit on the 2024 EEO.

## COUNT ONE
### (Disparate Treatment in Violation of § 501 of the Rehabilitation Act)

106.    Mr. Lenzi repeats and realleges all preceding paragraphs as if fully set forth herein.

107.    Mr. Lenzi has a documented and diagnosed disability. The Agency has recognized this by previously providing a reasonable accommodation for his disability.

108.    Each individual named in this action was aware of Mr. Lenzi's disability.

109.    Solely because of Mr. Lenzi's disability, the Agency has treated Mr. Lenzi very differently than it treats similarly situated employees who are not disabled.

110.    Mr. Lenzi received exceptional performance evaluations while in Helsinki, as shown in his EERs. He also received several award nominations.

111.    Mr. Lenzi was qualified for a TDY in Kyiv, Ukraine.

112.    The role was available to "[a]ll interested and available SEOs."

113.    Mr. Lenzi quickly asked his supervisor, Mr. McMurry, for approval to apply for the TDY. On September 7, 2023, Mr. McMurry provided approval.

114.    At all relevant times, the bidding website showed that Mr. Lenzi was the only approved applicant.

115.    After applying, Mr. Lenzi emailed Mr. Knarr regarding his interest in the position.

116.    On September 8, 2023, Mr. Knarr thanked Mr. Lenzi for volunteering but announced that "we no longer need another SEO on the trip . . . [because] recent events have now invalidated that need." Apparently, within approximately one day, "the needs of the mission changed."

117. The same day, Mr. Lenzi received an email that the Kyiv TDY "has been cancelled."

118. Mr. Lenzi chose to email Mr. Knarr because of past incidents where Mr. Knarr chose less qualified SEOs for TDYs and cancelled other Kyiv TDYs where Mr. Lenzi was the only approved applicant.

119. On September 20, 2023, during an office visit to Helsinki, Mr. McMurry told Mr. Lenzi that Mr. McMurry believed Mr. Knarr was making excuses and pretexts for Mr. Lenzi not going on a TDY to Kyiv. Mr. McMurry further stated that "Knarr and some in Washington ([Ralph] Gaspard, [Tamika DaShawn] Abbott, [Ronald] Stuart) know you are the most qualified but simply don't want you going on this TDY." Mr. McMurry confirmed his belief that management discriminated against Mr. Lenzi by repeatedly passing over him for a TDY in Kyiv.

120. Each of these individuals were aware of Mr. Lenzi's documented disability for a diagnosed TBI, as well as Mr. Lenzi's prior EEO activity.

121. Defendants' rejection of Mr. Lenzi through cancelling the TDY when he was the only applicant amounts to disability discrimination. Mr. Lenzi had only been posted in Helsinki for approximately one month when this occurred.

122. Beginning in February 2024, Mr. Lenzi was subjected to a campaign of negative rumors about his management, including allegations that staff avoided working with him, suggestions that he would be removed from post, and warnings not to report retaliation.

123. The dissemination of false narratives and managerial indifference (or encouragement) to this campaign led to workplace ostracization and had an adverse impact on Mr. Lenzi's health and reputation.

124. It also led to Mr. Lenzi being involuntarily curtailed from his Helsinki post.

125.    In August 2024, Mr. McMurry refused to sign off on an award nomination by Ambassador Brewer. Mr. Lenzi was qualified for and earned the nomination through his hard work and advocacy.

126.    Mr. McMurry refused to sign off on it due to Mr. Lenzi's disability.

127.    Other officials saw no reason the nomination could not go forward and signed the document.

128.    On information and belief, other similarly situated but non-disabled officers have not had this level of scrutiny to sign off on an award nomination.

129.    In or around early September 2024, Mr. McMurry prevented Mr. Lenzi from going on TDY posts he applied for. Mr. Lenzi was qualified for each of them. For some of the TDYs, Mr. Lenzi's entire team was there without him.

130.    Mr. McMurry justified this by requiring Mr. Lenzi to take two writing courses. After nearly 15 years with the State Department, Mr. Lenzi's writing was already exceptional and he had won Department of State awards for his writing ability.

131.    On information and belief, no other similarly situated but non-disabled officers were prevented from going on TDYs until they completed these writing courses. The courses are not required in the State Department.

132.    Mr. McMurry created this requirement specifically for Mr. Lenzi, to ensure he could not go on a TDY. Mr. McMurry took these actions against Mr. Lenzi due to his disability.

133.    Any one of the TDYs for which Mr. Lenzi was required to go on as part of his responsibilities would have been able to reasonably accommodate Mr. Lenzi's disability without harm to his compensation, benefits, and career opportunities and prospects.

24

134.    The fact that Mr. Lenzi's excellent work performance has continued even despite his disability and Defendants' actions shows that the decision to deny Mr. Lenzi TDY assignments was made solely on account of his disability.

135.    Mr. Lenzi has also unfairly been involuntarily curtailed from his post in Helsinki and designated as Overcomplement because of his disability, which has undercut his significant efforts to advance in his career. On information and belief, similarly situated employees with the State Department who are not disabled have not been subject to this type of treatment.

136.    Mr. Lenzi has suffered damages as a result of the Agency's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, increased stress and TBI symptoms, and the emotional and physical costs of bringing this action.

137.    The Agency intentionally violated Mr. Lenzi's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

**COUNT TWO**
**(Retaliation in Violation of § 501 of the Rehabilitation Act)**

138.    Mr. Lenzi repeats and realleges all preceding paragraphs as if fully set forth herein.

139.    Mr. Lenzi engaged in protected activity when he requested and received official accommodations from DRAD and extensions thereto, when he filed various EEO complaints pertaining to the Agency's repeated failures and discrimination, and when he made informal complaints to his supervisors.

140.    Each individual named in this action was aware of Mr. Lenzi's protected activity.

141.    After Mr. Lenzi filed an EEO in September 2023, Mr. Lenzi's supervisors (who were mentioned in the EEO), retaliated against Mr. Lenzi. They did so by subjecting him to a campaign of negative rumors about his management, including allegations that staff avoided

25

working with him, suggestions that he would be removed from post, and warnings not to report retaliation.

142. Mr. Lenzi informally complained to his supervisors multiple times throughout late 2023 and early 2024 about the discrimination and retaliation he was facing. For example, he raised the issue of the false rumors, disability accommodations, and harassment he was regularly facing. Yet, the retaliation continued and even worsened.

143. The dissemination of false narratives and managerial indifference (or encouragement) to this campaign led to workplace ostracization and had an adverse impact on Mr. Lenzi's health and reputation.

144. It also led to Mr. Lenzi being involuntarily curtailed from his Helsinki post. Mr. Lenzi was also removed from this post in retaliation for naming his supervisors and other high-level personnel in his EEO Complaints.

145. In August 2024, Mr. McMurry refused to sign off on an award nomination by Ambassador Brewer. Mr. Lenzi was qualified for and earned the nomination through his hard work and advocacy.

146. Mr. McMurry refused to sign off on it in retaliation for Mr. Lenzi's EEO Complaint.

147. Other officials saw no reason the nomination could not go forward and signed the document.

148. In or around early September 2024, Mr. McMurry prevented Mr. Lenzi from going on TDY posts he applied for. Mr. Lenzi was qualified for each of them. For some of the TDYs, Mr. Lenzi's entire team was there without him.

149. Mr. McMurry justified this by requiring Mr. Lenzi to take two writing courses. After nearly 15 years with the State Department, Mr. Lenzi's writing was already exceptional. On

information and belief, no other SEOs with Mr. Lenzi's experience were prevented from going on TDYs until they completed these courses. The courses are not required in the State Department.

150.   Mr. McMurry created this requirement specifically for Mr. Lenzi, to ensure he could not go on a TDY that was vital for Mr. Lenzi's position. This was done in retaliation for naming Mr. McMurry in an EEO Complaint.

151.   Any one of the TDYs to his three constituent posts for which Mr. Lenzi should have gone on would have been able to reasonably accommodate Mr. Lenzi's disability without harm to his compensation, benefits, and career opportunities and prospects. In fact, prior to being prevented from going on TDYs to posts he was responsible for, Mr. Lenzi had successfully completed approximately a dozen TDYs to these constituent posts and in fact had been nominated for prestigious Department of State awards for his performance on these TDYs.

152.   The fact that Mr. Lenzi's excellent work performance has continued even despite his disability and Defendants' actions shows that the decision to deny Mr. Lenzi TDY assignments was made in retaliation for his protected actions related thereto.

153.   Mr. Lenzi has suffered damages as a result of the Agency's unlawful retaliatory actions, including emotional distress, past and future lost wages and benefits, increased stress and TBI symptoms, and the emotional and physical costs of bringing this action.

154.   The Agency intentionally violated Mr. Lenzi's rights under the Rehabilitation Act with malice or reckless indifference, and, as a result, is liable for punitive damages.

**COUNT THREE**
**(Hostile Work Environment**
**in Violation of 42 U.S.C. § 12112(a))**

155.    Mr. Lenzi repeats and realleges all preceding paragraphs as if fully set forth herein.

156.   Mr. Lenzi has a documented and diagnosed disability.

157.   Mr. Lenzi was subjected to harassment based on his disability.

27

158.    Throughout late 2023 and 2024, Mr. Lenzi received significant pushback and harassment from his supervisors regarding his ability to telework and coming into the office late to perform his prescribed brain injury therapies in the morning. Mr. Lenzi was allowed to telework and take breaks to do brain injury therapies consistent with his reasonable accommodation.

159.    Mr. Lenzi's supervisors and high-level personnel for Defendants spread false rumors that his staff was coming to work early to avoid working with Mr. Lenzi.

160.    Mr. Lenzi received threats from his supervisors of being kicked out of his Helsinki post, which occurred in November 2024.

161.    Mr. Lenzi was told by his supervisors not to report incidents of retaliation.

162.    During this time, Mr. Lenzi's supervisors also prevented him from going on several TDYs to constituent posts he was responsible for. Leading his staff on these TDYs was a crucial part of Mr. Lenzi's work responsibilities. This is particularly true for the TDYs where Mr. Lenzi's entire team was approved to go without him.

163.    Mr. Lenzi was instead given heightened requirements to complete writing courses.

164.    Mr. Lenzi received constant criticism on his writing skills under Mr. McMurry— far more than he ever experienced at the State Department.

165.    Over the approximately 15 years Mr. Lenzi has worked for the State Department, Mr. Lenzi has already developed exceptional writing skills.

166.    On information and belief, no other similarly situated, non-disabled SEO has ever been restricted from going on a TDY based on failing to take writing classes.

167.    Mr. Lenzi also faced increased scrutiny when seeking approval for his nomination regarding his disability advocacy work. Mr. McMurry did not approve the nomination due to Mr. Lenzi's disability.

28

168.     Each of these acts—including the alteration of Mr. Lenzi's job responsibilities and requirements, increased scrutiny on his writing and disability award nomination, false rumors, threats, and pushback on his reasonable accommodation and treatment for his disability—is further evidence of the significant and constant harassment Mr. Lenzi faced throughout late 2023 and 2024 by his supervisors.

169.     This harassment and hostile work environment led to an increase in Mr. Lenzi's blood pressure and stress, increasing his post-concussion headaches, among other injuries.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment as follows:

A.  Accept jurisdiction over this matter;

B.  Award Plaintiff for his past and future loss of wages and benefits, including back pay and front pay, plus interest;

C.  Award Plaintiff five years of service credit toward his State Department retirement;

D.  Order Defendant to reinstate Plaintiff to a position comparable to his former positions at U.S. Embassies abroad or, in lieu of reinstatement, award him front pay (including benefits);

E.  Award Plaintiff financial compensation for emotional distress, pain, and suffering— including from headaches;

F.  Order Defendant to institute EEO training focusing on disability discrimination and retaliation for all DS personnel ranked FP-02 and higher;

G.  Award to Plaintiff all costs and reasonable attorneys' fees incurred in connection with this action;

H.  Grant Plaintiff such additional or alternative relief as the Court deems just and proper.

[*Remainder of Page Intentionally Left Blank*]

[*Remainder of Page Intentionally Left Blank*]

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims properly triable by a jury.


Dated: October 7, 2025                    Respectfully submitted,

                                          */s/ Christopher A. Suarez*

                                          Christopher A. Suarez (94400)
                                          Steptoe LLP
                                          1330 Connecticut Avenue, NW
                                          Washington, DC 20036
                                          Telephone: (202) 429-3000
                                          Email: CSuarez@steptoe.com


                                          *Counsel to Plaintiff Mark Lenzi*

31